## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

---

S-3 PUMP SERVICE, INC.,               CIVIL ACTION NO. 18-0450
     APPELLEE

VERSUS                           JUDGE ELIZABETH ERNY FOOTE

FIRST NATIONAL CAPITAL, LLC,       MAGISTRATE JUDGE HORNSBY
     APPELLANT

---

## MEMORANDUM RULING

Before the Court is an appeal filed by Appellant First National Capital, LLC ("FNC") from the Bankruptcy Court for the Western District of Louisiana's March 21, 2018 judgment denying FNC's motion for summary judgment, granting Appellee S-3 Pump Service Inc.'s ("S-3 Pump") motion for partial summary judgment, and awarding S-3 Pump attorney's fees and interest. [Record Document 1]. This matter was fully briefed [Record Documents 14, 17, and 24] and, pursuant to the Court's order, FNC filed updated briefing clarifying its record citations. [Record Documents 26-2 and 26-3]. The matter is now ripe for review. For the reasons stated herein, the judgment of the bankruptcy court [Bankr. Document 309][1] is hereby **AFFIRMED**.

---

[1]"Bankr. Document" refers to entries contained in the docket in the underlying proceeding, *S-3 Pump Serv., Inc. v. First Nat'l Capital, LLC* (*In re S-3 Pump Serv., Inc.*), Ch. 11 Case No. 16-10383, Adv. No. 16AP-01009 (Bankr. W.D. La. adversary proceeding filed Aug. 31, 2016). If this Court has referred to a bankruptcy document that is not contained in the record

# BACKGROUND

### I. Facts

S-3 Pump is an oilfield service company engaged in completing oil and natural gas wells using costly machinery called frac pumps. To finance the purchase of new frac pumps, S-3 Pump entered discussions with an equipment finance company, FNC. [Record Document 27-2 at 3]. After some preliminary discussion, S-3 Pump delivered an executed Letter of Intent to FNC on February 13, 2012 in which S-3 Pump offered to lease from FNC up to eight pieces of equipment with a total equipment cost of up to $8,540,000.00. [Record Documents 2-5 at 6-9 and 27-2 at 3]. The Letter of Intent further detailed that the "[l]lease documentation [would] be FNC's standard Master Lease Agreement and Lease Schedule and supporting documents." [Record Document 2-5 at 8].

The parties subsequently entered into a Master Equipment Lease Agreement ("Master Lease") on March 26, 2012. [Record Document 2-5 at 1-5]. This document outlines a general agreement between the parties applicable to future financing agreements for each individual piece of equipment, called Equipment Schedules ("Schedules"). [*Id.*] Among the relevant provisions of the Master Lease are: a statement that in the event of a conflict between the Master Lease and a Schedule, the terms of the Schedule govern; a definition of "Lease Documents"; and an entire agreement clause stating that "[e]ach Lease, together with all other

---

on appeal, the Court hereby takes judicial notice of the document. *See ITT Rayonier Inc. v. United States*, 651 F.2d 343, 345 n.2 (5th Cir. Unit B July 20, 1981) ("A court may . . . take judicial notice of [the] records . . . of inferior courts.").

2

Lease Documents, constitutes the entire understanding or agreement between Lessor and Lessee with respect to the leasing of Equipment covered thereby, and there is no understanding or agreement, oral or written, which is not set forth herein or therein." [*Id.*]

Between March 2012 and June 2012, the parties entered into a series of lease agreements that are not at issue in the instant litigation. The transactions followed the same pattern. First, FNC transmitted to S-3 Pump an Approval Letter stating that FNC "approved and accepted" S-3 Pump's offer to lease equipment. [Record Document 2-5 at 10-15]. These Approval Letters (collectively, "Non-Subject Approval Letters") provide for a forty-eight-month long lease payment period. [*Id.*]. Each of the Non-Subject Approval Letters requires S-3 Pump to pay a deposit equal to one month's rent and states that the deposit payments are to be applied to the final month's lease payment. [Record Document 2-5 at 11, 13, 15]. S-3 Pump accepted the terms of each Non-Subject Approval Letter and paid the deposits. [Record Documents 2-5 at 11, 13, 15 and 27-2 at 4]. After S-3 Pump paid the deposit, the parties executed an Equipment Schedule (collectively, "Non-Subject Schedules") for each piece of equipment. [Record Documents 2-5 at 16-23]. Each of the three Non-Subject Schedules states that the initial term of the lease is forty-eight months, records S-3 Pump's deposit payment, and reiterates that the deposit is to be applied to the last month's rent or treated as a fee in the event of breach. [Record Document 2-5 at 16, 19, 22]. Each Schedule specifies that it is issued in connection with the Master Lease and does not mention the Non-Subject Approval Letters. [*Id.*]

By executing each of the Non-Subject Schedules, FNC and S-3 Pump completed an independent financing agreement for each respective piece of equipment (collectively "Non-Subject Financing Contracts").[2] FNC assigned its rights in each of the Non-Subject Financing Contracts to third parties. [Record Document 2-25 at 1-9]. In these assignments, FNC disclosed the existence of S-3 Pump's deposit as recorded on the Non-Subject Schedules or stated that the forty-eighth month's payment was paid in advance. [Record Document 2-25 at 2, 5, 7]. FNC also reduced the assignment value of each contract in the amount of the deposit owed. [Record Document 2-25 at 18-20]. S-3 Pump and FNC executed a Notice and Acknowledgement of Assignment for each assignment that again acknowledged the effect of the deposit payments. [Record Document 2-25 at 10-17].

Starting in August 2012, the terms in the Approval Letters changed. Instead of a forty-eight-month lease, the lease length increased to fifty months. [Record Documents 2-6 at 6-7, 2-7 at 12-13, 2-9 at 5-6, 25-26, and 2-10 at 19-20, 27-28]. FNC increased the deposit amount from one month's rent to two months' rent. [*Id.*] The Approval Letters maintain the arrangement whereby the deposits are to be applied to the final monthly payments if S-3 Pump does not default on the agreement. [*Id.*] S-3 Pump accepted the terms in each of the Approval Letters (collectively, "Subject Approval Letters") and paid the requisite deposits. [*Id.* and Record Document 27-1].

---

[2] Each of the Non-Subject Financing Contracts can be individually identified by the Schedule associated with it. Therefore, the Court may also refer to a specific contract by reference to its associated Schedule number.

4

Similar to what occurred in connection with the Non-Subject Approval Letters, the parties executed Schedules for each individual piece of equipment. [Record Documents 2-3 at 19-20, 2-6 at 12-13, 26-27, 2-7 at 14-15, 28-29, 2-9 at 15-16, 28-29, 2-10 at 10-11, 16-17, 21-22, 29-30, and 2-11 at 10-11]. The parties also executed three Schedules during this time that were not preceded by an Approval Letter, although S-3 Pump still paid a deposit equal to two months' rent.[3] [Record Documents 2-27 at 3-4, 2-28 at 5-6, 13-14, and 27-2 at 7-10]. By executing each of the fifteen Schedules (collectively, "Subject Schedules"), the parties created fifteen independent financing agreements (collectively, "Subject Financing Contracts").

Unlike the Non-Subject Schedules, however, the Subject Schedules did not facially match their corresponding Approval Letters. Instead of stating that the initial term of the lease was fifty months and recording S-3 Pump's deposit payment worth two months' rent, the Subject Schedules state that the "Initial Term" of the lease is forty-eight months with a "$0" deposit. [Record Documents 2-3 at 19-20, 2-6 at 12-13, 26-27, 2-7 at 14-15, 28-29, 2-9 at 15-16, 28-29, 2-10 at 10-11, 16-17, 21-22, 29-30, 2-11 at 10-11, 2-27 at 3-4, and 2-28 at 5-6, 13-14]. Like the Non-Subject Schedules, the Subject Schedules specifically reference and incorporate the Master Lease and do not mention the Approval Letters. [*Id.*]

---

[3] Schedule 09 was not preceded by any documentation besides an invoice for a deposit payment equal to two months' rent. [Record Documents 2-27 at 3-6 and 27-2 at 7-8]. Schedule 10 and Schedule 11 were issued in connection with a second Letter of Intent dated February 5, 2013. [Record Documents 2-28 at 5-6, 13-14, 2-50 at 1-4, and 27-2 at 8-10]. Like the Subject Approval Letters, the February 2013 Letter of Intent stated that the lease would be fifty months and S-3 Pump would pay a deposit equal to two months' rent and applicable to the last two payments. [Record Document 2-50 at 2, 4].

FNC also assigned the Subject Financing Contracts to various assignees. However, unlike the earlier assignments, FNC did not reduce the consideration paid by the assignees to account for the deposits. [Record Documents 2-26 at 4-8, 14-16, 2-27 at 7-9, 2-28 at 8-10, 2-29 1-17, 27-29, 2-30 at 6-8, 2-31 at 10-27, 2-32 at 14-23, 2-33 at 1-20, 2-34 at 8-26, and 2-36 at 1-4]. For thirteen of the fifteen Subject Financing Contracts, FNC and S-3 Pump executed a Notice and Acknowledgement of Assignment stating that FNC was assigning all of its rights to the assignees and stating the remaining monthly payment owed under each contract without reference to the term being shortened due to the application of deposit payments.[4] [Record Documents 2-26 at 9-10, 2-27 at 1-2, 10-12, 2-28 at 11-12, 2-30 at 1-2, 9-10, 2-31 at 28-29, 2-33 at 21-23, 2-35 at 16-19, and 2-36 at 5-8]. None of the assignment documents mention the Subject Approval Letters.

## II.   **The Bankruptcy Proceedings**

After all of the Subject Schedules were executed and FNC assigned the contracts to third parties, S-3 Pump filed for Chapter 11 bankruptcy. As part of that proceeding, S-3 Pump filed an adversary proceeding against FNC to recover $647,837.56 in deposits that S-3 Pump alleged FNC wrongfully retained under the terms of the fifteen Subject Financing Contracts.

---

[4] The two Subject Financing Contracts for which this did not occur were those related to Schedule 04 and Schedule 05. For these contracts, FNC and S-3 Pump's Notice and Acknowledgement of Assignment state that there were forty-eight payments remaining "after crediting any advance payment, deposit or other payments previously paid to [FNC]." Record Document 2-52 at 1-4]. These Financing Contracts were not part of S-3 Pump's motion for partial summary judgment. [Record Documents 2-22 and 2-41].

6

[Record Document 2-14]. S-3 Pump filed a motion for partial summary judgment seeking a judgment that FNC breached thirteen of the Subject Financing Contracts by wrongfully retaining deposit payments. [Record Documents 2-22 and 2-41 at 5, n.4] In total, S-3 Pump sought damages of $545,413.48 plus interest. [Record Document 2-22 at 2]. FNC also filed a motion for summary judgment seeking a judgment that FNC was entitled to retain the deposits paid in connection with each of the fifteen Subject Financing Contracts in S-3 Pump's complaint. [Record Documents 2-42, 2-43, and 27-38].

The bankruptcy court granted S-3 Pump's motion for partial summary judgment and denied FNC's motion. [Record Document 2-71 at 1-14]. To begin, the court noted that eight of the Subject Financing Contracts included in S-3 Pump's motion for partial summary judgment were governed by Texas state law and the remaining five were governed by New York state law. [Record Document 2-71 at 9]. After reviewing the law of both states, the court determined that the law applied to a specific contract was immaterial because both state's laws dictated the same outcome. [*Id.*]

In its ruling, the court compared the language in the Subject Approval Letters stating that the parties agreed to a fifty-month lease and a two months' rent deposit payment to be applied to the last two months of the lease with the language in the thirteen Subject Schedules stating that S-3 Pump was obligated to make payments over forty-eight months and pay no deposit. [Record Document 2-71 at 8-14]. The bankruptcy court concluded that the contract documents at issue were not ambiguous—the parties intended that the Master Lease and

Schedules would govern each individual Financing Contract and in the event of an inconsistency between the documents, the terms of the Schedule would govern. [Record Document 2-71 at 10]. The court further concluded that the Subject Approval Letters were not binding agreements between FNC and S-3 Pump. [Record Document 2-71 at 11]. Therefore, the bankruptcy court looked to the language of the Schedules and determined that the parties had agreed to a forty-eight-month lease without a deposit in each of the Subject Financing Contracts. [Record Document 2-71 at 13]. The court concluded that FNC breached the clear language of the thirteen Subject Financing Contracts included in S-3 Pump's motion for partial summary judgment by retaining deposit payments to which it was not entitled under the Subject Financing Contracts and the court entered judgment in favor of S-3 Pump in the amount of the wrongfully retained deposits—$545,413.48 [Record Documents 1-1 at 1-2 and 2-71 at 13]. The court denied FNC's motion for summary judgment. [*Id.*]

Having concluded that FNC breached thirteen of the Subject Financing Contracts, the bankruptcy court addressed the issue of interest and attorney's fees.[5] The court held that S-3 Pump was only able to recover attorney's fees for work related to the eight Subject Financing Contracts governed by Texas law because New York law did not allow for the recovery of fees and the Subject Financing Contracts did not give S-3 Pump the right to recover attorney's

---

[5] FNC does not challenge the bankruptcy court's determination that interest should be assessed to S-3 Pump's damages award or the court's calculation of interest fees. FNC also does not challenge the bankruptcy court's award of $30,000 in additional attorney's fees should FNC ultimately be unsuccessful on appeal. Thus, this Court will not address these issues.

fees. [Record Document 2-89 at 11-12]. After holding a hearing on the issue of attorney's fees and reviewing S-3 Pump's billing records, the court concluded that S-3 Pump had adequately segregated unrecoverable fees from recoverable fees and awarded S-3 Pump $169,793.75 in attorney's fees. [Record Documents 1-1 at 2 and 2-89 at 14].

Following the entry of final judgment, FNC filed the instant appeal. FNC argues that the bankruptcy court erroneously granted S-3 Pump's motion for partial summary judgment and, further, that the court improperly found that S-3 Pump had satisfied its burden of segregating non-recoverable attorney's fees from recoverable attorney's fees.

## JURISDICTION

District courts have appellate jurisdiction over final judgments, orders, and decrees issued by bankruptcy courts. 28 U.S.C. § 158(a) (2012).

## STANDARD OF REVIEW

In reviewing a decision by a bankruptcy court, a district court functions as an appellate court, applying the same standards of review applied by federal appellate courts. *In re Webb* (*Webb v. Reserve Life Ins. Co.*), 954 F.2d 1102, 1103–04 (5th Cir. 1992). Thus, a bankruptcy court's discretionary decisions are reviewed under an abuse of discretion standard, findings of fact are reviewed for clear error, and legal conclusions are reviewed de novo. *In re ASARCO, L.L.C. (ASARCO v. Barclays Capital, Inc.)*, 702 F.3d 250, 257 (5th Cir. 2012).

## LAW AND ANALYSIS

### I.   <u>Applicable Law</u>

As a preliminary matter, the Court must determine which law applies to each of the Subject Financing Contracts. Under the terms of the Master Lease, Texas law applies to "all matters of construction, validity and performance." [Record Document 2-5 at 4, ¶26(b)]. Thus, as a general rule, the Court must apply Texas law. For five of the thirteen Subject Financing Contracts that were included in S-3 Pump's motion for partial summary judgment, though, the parties later agreed that New York law would govern, and the Court must apply New York law to those contracts. [Record Documents 2-27 at 10-11, 2-29 at 18, 2-31 at 28-30]. To be clear, New York law applies to the Subject Financing Contracts created by Schedules 09, 11, 17, 18, and 19. Texas law applies to the Subject Financing Contracts created by Schedules 07, 08, 10, 12, 13, 22, 23, and 24.

### II.   <u>Rules of Contract Interpretation</u>

The rules of contract interpretation under Texas and New York law are similar. In both states, the primary goal of a court is to "ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017). This means that the plain language of a contract should control, "not what one side or the other alleges they intended to say but did not." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019) (quoting *Great Am. Ins. Co. v.*

*Primo*, 512 S.W.3d 890, 893 (Tex. 2017)); *Nomura Home Equity Loan, Inc.*, 92 N.E.3d at 747. A court should consider the writing in its entirety and attempt to "harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker*, 650 S.W.2d at 393 (emphasis in original); *Cortlandt St. Recovery Corp., v. Bonderman*, 96 N.E.3d 191, 198 (N.Y. 2018). A court should not give controlling effect to one provision read in isolation but should instead read all provisions together and with reference to the entire contract. *Coker*, 650 S.W.2d at 393; *Cortland St. Recovery Corp.*, 96 N.E.3d at 198.

When a contract "can be given a certain or definite legal meaning or interpretation[, it] is not ambiguous and will therefore be construed as a matter of law." *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889; *Cortland St. Recovery Corp.*, 96 N.E.3d at 198. "Whether a contract is ambiguous is [also] a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889 (quoting *Coker*, 650 S.W.2d at 394); *Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 597-98 (5th Cir. 2017). However, this does not mean that a court can rely on evidence of the surrounding circumstances to create an ambiguity that does not already exist in the contract's language. *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889; *Feld Motor Sports, Inc.*, 861 F.3d at 598.

## III.   <u>Contract Interpretation</u>

The parties devoted portions of their arguments on appeal to debating whether the Subject Approval Letters should be considered binding "Lease Documents." [Record

Documents 17 at 34-36 and 26-2 at 19-24, 30-37, 54-59]. Ultimately, this is of no consequence because the clear terms of the Subject Schedules govern the parties' agreement either way.

The Court will first assume *arguendo* that the Subject Approval Letters were not binding, either because they were not included in the Lease Documents as defined by the Master Lease or because the Subject Approval Letters were not themselves binding contracts. Under this assumption, the only relevant Subject Financing Contract Lease Documents presented to the Court for consideration are the Master Lease and the Subject Schedules. Looking to those documents, the terms of the agreement are clear—per the Subject Schedules, the parties agreed to a forty-eight-month lease and no deposit payment. [Record Document 2-7 at 14-15].[6] Because the terms of this agreement are not ambiguous, the parole evidence rule prevents the Court from considering the Subject Approval Letters or the course of dealing between the parties. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy*, LLC, 573 S.W.3d 198, 206 (Tex. 2019) ("Where contracts are unambiguous, we decline to consider the parties' course of performance to determine its meaning."); *Feld Motor Sports, Inc.*, 861 F.3d at 598 ("The court looks only within the four corners of an unambiguous contract to discern its meaning."). Therefore, under the clear terms of the Subject Schedules, the parties agreed to a forty-eight-month lease without a deposit payment and FNC is not entitled to retain the $545,413.48 in

---

[6] For clarity, the Court will cite only to Approval Letter 05 and one of its related Schedules, Schedule 07, as an exemplar for all of the Subject Financing Contracts. [Record Document 2-7 at 12-15].

deposits paid in connection with the thirteen Subject Financing Contracts at issue in S-3 Pump's motion for partial summary judgment.

Assuming that the Subject Approval Letters were binding and included in the Master Lease's definition of Lease Documents such that the Court must consider them as part of the Subject Financing Contracts, the outcome does not change. Simply put, the Subject Financing Contracts in this scenario contain inconsistent terms, but the contracts also show an unambiguous intent that the terms of the Schedules should control in the event that the contracts contain inconsistencies. Thus, the Court must look to the terms stated in the Schedules to determine the terms of each Subject Financing Contract.

With the Subject Approval Letters considered Lease Documents, the inconsistent terms of the contract are found in the Subject Approval Letters and the Subject Schedules. The Subject Approval Letters state that the "Initial Lease Term" is fifty months and that S-3 Pump must pay a deposit equal to two months' rent. [Record Document 2-7 at 13]. The Subject Schedules, executed after their respective Subject Approval Letters, state that the "Initial Term" of the lease is forty-eight months with no deposit payment. [Record Document 2-7 at 14]. The use of "Initial Term" in both the Subject Schedules and Subject Approval Letters conflicts because that term is defined by the Master Lease and the documents state that they are issued in connection with the Master Lease. [Record Documents 2-5 at 1 and 2-7 at 12-15]. The Subject Schedules also dictate that any "capitalized terms used [in the Subject Schedules] shall have the meanings specified in the Master Lease." [Record Document 2-7 at

14]. Looking to the Master Lease, the "Initial Term" is the term that will "commence on the Initial Term Commencement Date and, unless earlier terminated as provided herein, shall expire on the Initial Term Expiration Date." [Record Document 2-5 at 1, ¶ 6]. Therefore, the use of "Initial Term" has a specific meaning and the use of "Initial Term" in both documents creates a conflict because each document states a different term length.

The parties anticipated that conflicts in the terms of the agreement may arise between different Lease Documents, however, and they provided unambiguous guidance on what to do in the case of such a conflict. The first paragraph of the Master Lease instructs that in any conflict between the terms of the Master Lease and a Schedule, the Schedule should govern the terms of the agreement. [Record Document 2-5 at 1, ¶ 1]. The Subject Schedules contain an identical clause. [Record Document 2-7 at 15, ¶ 9]. Further, nearly every definition relating to a "Term" in the Master Lease states that the terms will be determined by the Schedule associated with each of the Subject Financing Contracts. For example, the Master Lease states that the "'Initial Term Expiration Date' shall have the meaning specified in the applicable Schedule." [Record Document 2-5 at 1, ¶ 2]. In defining "Term," the Master Lease states the definition, but notes that this definition only remains accurate as long as it is not "otherwise specified on a Schedule." [*Id.* at 1, ¶ 6]. Finally, nowhere do the Master Lease or the Subject Schedules mention by name the existence of or potential controlling nature of the Subject Approval Letters.

14

The Subject Approval Letters do not change this conclusion. In the Subject Approval Letters, FNC accepts S-3 Pump's offer to lease equipment and states that the approval is "subject to the general pricing and terms outlined below," which includes a fifty-month lease and two months' rent deposit payment. [Record Document 2-7 at 12-13]. The Subject Approval Letters also state that "[a]ll other terms" are subject to the Master Lease and the Schedule to follow the Approval Letter. [Record Document 2-7 at 12]. According to FNC, this means that the Schedules cannot modify any terms of the agreement specifically laid out in the Subject Approval Letters, including the length of the lease and deposit requirement. [Record Document 26-2 at 33-37]. FNC's position is inconsistent with the terms of the Master Lease, however. In defining Lease Documents, the Master Lease contemplates that Lease Documents "may be modified, amended, extended, or replaced." [Record Document 2-5 at 1]. Hence if the Subject Approval Letters are "Lease Documents," they may be amended or modified. In this case, they were amended by the conflicting Subject Schedules that followed each Subject Approval Letter. Additionally, the Subject Approval Letters' broad mention of "general pricing and terms" contrasted with "all other terms," when considered in the context of the Subject Financing Contracts as a whole, does not demonstrate that the parties intended the Subject Approval Letters to govern in the event of a conflict.

The parties' intent to have the terms of the Schedule govern the agreement is also evidenced by the fact that for three of the Subject Financing Contracts, the parties did not execute an Approval Letter. [Record Documents 2-27 at 3-4, 2-28 at 5-6, 13-14, and 27-2 at

15

7-10]. The Court cannot logically conclude that the parties intended a document which did not exist to govern an agreement.[7]

While the Court cannot consider the parties' prior contracts in interpreting the Subject Financing Contracts because it does not find that the contracts are ambiguous, it notes that the Non-Subject Financing Contracts also support the finding that the parties intended the Subject Schedules to dictate the terms of the agreement. In the Non-Subject Financing Contracts, the parties recorded identical lease length and deposit requirements in both the Non-Subject Approval Letters and the Non-Subject Schedules. [Record Document 2-5 at 10-11, 16-17].[8] This demonstrates that when the parties agreed to a term of forty-eight months and a one month's rent deposit payment to be applied to the final monthly payment, they were capable of recording such an agreement in a Schedule. Further, when the parties intended the final agreement to be what was stated in the Approval Letter, they made sure to record that agreement in the corresponding Schedule, which demonstrates that the parties intended the Schedules to be a controlling document that reflected their final agreement.

---

[7] Nor do the terms of the Master Lease's entire agreement clause allow the Court to reach this conclusion because under that clause, the Lease Documents constitute the entire agreement between the parties and there are no other agreements which are not contained in the Lease Documents. [Record Document 2-5 at 5, ¶ 28]. For the Subject Financing Contracts created by Schedules 09, 10, and 11, then, any agreement to a fifty-month lease and two months' rent deposit payment are not recorded in any Lease Document and therefore are not part of the parties' final agreement.

[8] For clarity, the Court will only cite to one Non-Subject Approval Letter and its corresponding Schedule, Schedule 01, as an example. [Record Document 2-5 at 10-11, 16-17].

This reading of the contracts is also supported by representations FNC made when assigning the Subject Financing Contracts to third parties. For example, when assigning the Subject Financing Contract associated with Schedule 07, FNC represented that it was assigning all of its rights to the assignor. [Record Document 2-26 at 4, ¶ 2]. The assignment contract defines "Lease Documents" to include the Master Lease and Schedule 07 but does not mention the existence of an Approval Letter. [*Id.*]  FNC also represented that "the Lease and Lease Documents are the sole and entire understanding and agreement between [S-3 Pump] and [FNC], and there are no other agreements between them with respect to the subject matter of the Lease or the Equipment." [*Id.* at 4-5, ¶ 4(j)]. Combined, this is evidence that FNC intended the Subject Schedules, and not the Subject Approval Letters, to be the controlling document in setting the terms of its agreement with S-3 Pump.

The Court thus concludes that the terms stated in the Subject Schedules control. Under the terms of the Subject Schedules, the parties agreed that S-3 Pump would make forty-eight monthly payments for the equipment and pay no deposit. Therefore, FNC wrongfully retained $545,413.48 worth of deposits held in connection with each of the thirteen Subject Financing Contracts at issue in S-3 Pump's motion for partial summary judgment, and the bankruptcy court's judgment is **AFFIRMED.**

## IV.  **Attorney's Fees**

Having affirmed the bankruptcy court's judgment granting S-3 Pump's partial motion for summary judgment, the Court must now address the bankruptcy court's award of

attorney's fees to S-3 Pump. The bankruptcy court concluded that neither New York law nor the Subject Financing Contracts provide S-3 Pump the right to recover attorney's fees. Texas law, however, does allow for the recovery of attorney's fees related to breach of contract claims. [Record Document 2-89 at 11-12]. Therefore, S-3 Pump is only entitled to recover attorney's fees for breach of contract claim work relating to the eight Subject Financing Contracts governed by Texas Law ("Texas Subject Financing Contracts"). The bankruptcy court accordingly required S-3 Pump to segregate fees incurred for work on the breach of contract claims relating to the Texas Subject Financing Contracts from fees incurred for work relating only to the five Subject Financing Contracts governed by New York law ("New York Subject Financing Contracts") and to non-contract law claims, like turnover, related to any contract. On appeal, the parties do not take issue with the court's determination that S-3 Pump is only entitled to recover attorney's fees for work related to the Texas Subject Financing Contracts, and the Court therefore does not address this issue. FNC does challenge the adequacy of S-3 Pump's segregation of recoverable from unrecoverable fees. [Record Document 26-2 at 66-82].

a.  **Standard of Review**

The parties dispute the standard of review that this Court must apply when reviewing the bankruptcy court's judgment regarding attorney's fees. According to FNC, "[t]he need to segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact." [Record Document 26-2 at 79]. The Court is

thus required to conduct a de novo review of the bankruptcy court's judgment because reviewing courts apply the de novo standard of review to questions of law and to mixed questions of law and fact. [*Id.*] According to S-3 Pump, the Court should apply an abuse of discretion standard of review "[b]ecause the appropriate amount of an attorney fee is in the trial court's broad discretion." [Record Document 17 at 53]. S-3 Pump further argues that the amount of attorney's fees to be awarded is a question of fact which is reviewed only for clear error. [Record Document 17 at 53-54].

FNC is correct that a reviewing court should review de novo a lower court's decision about whether attorney's fees need to be segregated under Texas law. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312-13 (Tex. 2006). FNC also correctly cites the general rule that a mixed question of law and fact should receive de novo review under Fifth Circuit precedent. *Trinity Indus., Inc. v. United States*, 757 F.3d 400, 407 (5th Cir. 2014). However, in cases specifically reviewing a lower court's determination regarding the adequacy of a party's fee segregation, the Fifth Circuit applies an abuse of discretion standard. *E.g., Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 156 (5th Cir. 2017). Thus, the Court will review the bankruptcy court's determination about which fees need to be segregated de novo and the court's finding of whether S-3 Pump adequately segregated fees for abuse of discretion. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 297 (5th Cir. 2007) ("We review the district court's award of attorney's fees for abuse of discretion, although conclusions of law underlying the award are reviewed de novo.").

### b. **Attorney's Fees Segregation**

Under Texas law, when a party is only entitled to recover attorney's fees for one of its multiple claims, it must segregate fees incurred for work relating to the recoverable claims from work relating to the non-recoverable claims. *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 311. If "discrete legal services advance both a recoverable and unrecoverable claim," however, "they are so intertwined that they need not be segregated." *Id.* at 13-14. That is, "[t]o the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service." *Id.* at 313. "This standard does not require more precise proof for attorney's fees than for any other claims or expenses." *Id.* at 314. The party requesting attorney's fees bears the burden of segregating the fees. *Merritt Hawkins & Assocs., L.L.C.*, 861 F.3d at 156.

In this case, S-3 Pump was required to segregate fees charged for any work that was not related to the Texas Subject Financing Contracts breach of contract claims. This included fees for work related only to the New York Financing Contracts breach of contract claims and work related to other legal claims, such as turnover, for any of the contracts. The bankruptcy court held a hearing to address this issue. At the hearing, Robert Johnson ("Johnson"), S-3 Pump's attorney, testified that he generated the billing statement submitted to support S-3 Pump's fee request and included "work that [he] determined to relate to work for the breach of contract claim asserted by S-3 Pump against First National Capital and pertaining to those contracts on which the order for granting the motion for partial summary judgment was

entered." [Record Document 27-53 at 6-7]. Johnson explained that he removed all entries related to claims other than breach of contract, entries related to the two contracts (Schedules 04 and 05) that were not the subject of S-3 Pump's partial motion for summary judgment, and entries for time spent researching New York law or "items that [he] felt were unique to New York contracts." [*Id.* at 10, 19-20]. He testified that he did not segregate any time spent "specifically for Texas cases as opposed to work done specifically on those New York contracts." [*Id.* at 18]. He did not reduce time claimed for drafting any of the complaints to account for the fact that the complaints included paragraphs dedicated to the New York Subject Financing Contracts or other claims. [*Id.* at 21-22, 25, 29]. Johnson stated that he reduced some charges that appeared in the billing records, although he did not always document the reduction. [*Id.* at 12, 29]. Finally, Johnson testified that he did not spend "very much time" on work "related uniquely to the New York cases." [*Id.* at 18].

Relying on this testimony and a review of the billing statement, the bankruptcy court concluded that S-3 Pump had adequately removed any non-recoverable fees from its billing statement and did not need to further segregate charges appearing in the billing statement because the services advanced both recoverable and non-recoverable claims. [Record Document 2-89 at 14]. FNC argues that this was an erroneous conclusion for several reasons. First, Johnson's testimony at the hearing that he had already removed all non-recoverable work from the submitted billing records and his statement that not "very much" of the work in the case related uniquely to the New York Subject Financing Contracts were not adequate to meet

21

S-3 Pump's burden of proving segregation. [Record Documents 26-2 at 80 and 27-53 at 18]. Second, the billing records contain multiple entries for which the work completed during a particular billing period is unrecoverable. [Record Documents 26-2 at 73, 2-84, and 2-85 at 1-8]. Third, FNC contends that some portion of the work related to S-3 Pump's Complaint, Second Amended and Restated Complaint, and Third Amended and Restated Complaint must be segregated because each complaint contains the product of non-recoverable work. [Record Document 26-2 at 75-78]. S-3 Pump responds that the bankruptcy court's determination that it had adequately segregated recoverable from non-recoverable fees was not an abuse of discretion because it was supported by the billing records and Johnson's testimony. [Record Document 17 at 72].

The bankruptcy court applied the correct segregation standard and therefore this Court will review its determination that S-3 Pump adequately segregated its fee request for abuse of discretion. *Merritt Hawkins & Assocs., L.L.C.,* 861 F.3d at 156 (finding that a district court did not abuse its discretion in calculating a party's attorney's fee award when the court cited the correct legal standard and reduced the parties' request for failing to adequately document its fee segregation). After careful review of the billing statement and Johnson's testimony, the Court concludes that the bankruptcy court did not abuse its discretion in awarding S-3 Pump the requested attorney's fees.

First, the bankruptcy court had sufficient evidence to conclude that S-3 Pump segregated recoverable from non-recoverable fees. In many instances, attorneys segregate fees

by presenting to a court a record containing both recoverable and non-recoverable fees, providing testimony regarding an estimated percentage of the total work that was not recoverable, and then reducing the fee award by that percentage. *E.g., Navigant Consulting, Inc.*, 508 F.3d at 298 (allowing a court's proportionate reduction of fees when a party failed to segregate fees itself); *Sentinel Integrity Sols., Inc. v. Mistras Grp., Inc.* 414 S.W.3d 911, 929-30 (Tex. App. 2013) (upholding a fee award when the attorney segregated fees by reducing the requested amount by ten percent because that was the estimated percentage of work not directly related to or intertwined with the recoverable claims). This is not the only way to segregate fees, however. *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 314 (stating that *an example* of a way to segregate fees is to reduce the requested fee to the percentage of time that would have been incurred only for the recoverable claim) (emphasis added); *State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 104 (Tex. App. 2016) (deducting non-recoverable amounts from billing records is a sufficient, though not required, way of segregating attorney's fees).

In this case, S-3 Pump chose not to do a percentage reduction of its total fees and instead elected to excise any non-recoverable fees from the billing statement submitted to the bankruptcy court in support of its fee request. [Record Document 27-53 at 6-7]. As previously detailed, Johnson explained his methodology for excising fees to the court during the hearing. He presented billing statements containing only what S-3 Pump claimed to be recoverable fees which the bankruptcy court reviewed. Johnson also testified that not "very much" of the work related solely to the New York Subject Financing Contracts. This evidence is not meaningfully

different from the evidence accepted in cases where attorneys prove fee segregation by testifying that an estimated percentage of the requested fees that did not directly advance the recoverable claim or were not intertwined with that claim. Therefore, the bankruptcy court did not abuse its discretion by accepting Johnson's testimony and the detailed billing records as proof of adequate fee segregation.

Next, the bankruptcy court did not abuse its discretion by concluding that S-3 Pump had adequately segregated recoverable from non-recoverable fees despite the few entries on the billing statement containing descriptions of non-recoverable work. FNC points to seven entries in the billing statement as examples of entries containing non-recoverable work. [Record Document 26-2 at 73-74]. Of these examples, five are entries describing work such as researching how certain rules of law apply under Texas and New York law and two are entries stating that the only work completed during a time period was research of New York law. [*Id.*] The fact that the bankruptcy court may have inadvertently awarded fees for non-recoverable work in a handful of the approximately 240 entries contained in the billing records is not reversible error because Texas courts do not require perfect fee segregation. *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 314 ("Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim."). For example, in *State Farm Lloyds v. Hanson*, a Texas appellate court upheld an attorney's fee award where the attorney proved fee

segregation by testifying that he estimated five percent of the attorney's fees were attributable to non-recoverable work. *State Farm Lloyds*, 500 S.W.3d at 104-105. The appellate court compared the attorney's estimate of five percent with the actual billing records and found that when excising non-recoverable work, the amount that needed to be excised was "just over five percent" of the total fees. *Id.* at 105. Despite this discrepancy between the attorney's estimate and the court's calculation based on the billing records, it upheld the attorney's fee award that was reduced by only five percent to account for non-recoverable work. *Id.* The few erroneous awards in this case amount to no more of a deviation from the exact amount of recoverable fees than would occur in a case where attorney's fees were proven by an estimated percentage reduction, like the estimate accepted in *State Farm Lloyds*.[9]

Finally, the bankruptcy court did not abuse its discretion when it concluded that S-3 Pump could recover attorney's fees for time spent drafting each of its complaints. It is true that S-3 Pump did not formally raise its breach of contract claim until filing its Third Amended and Restated Complaint, but the bankruptcy court could reasonably conclude that drafting the

---

[9] If FNC is also asserting that the bankruptcy court erroneously allowed S-3 Pump to recover fees for work such as reviewing the New York Subject Financing Contracts, the Court rejects this argument. The Subject Financing Contracts in this case, whether governed by New York law or Texas law, were nearly identical. It was thus not an abuse of discretion for the bankruptcy court—the court most familiar with the instant litigation—to conclude that time spent reviewing New York Subject Financing Contracts also directly advanced the breach of contract claim for the Texas Subject Financing Contracts because any knowledge or insights gained from this review were equally applicable to the Texas Subject Financing Contracts. *Playboy Enters., Inc. v. Sanchez-Campuzano*, 561 F. App'x 306, 311 (5th Cir. 2013) (noting a district court's superior familiarity with a case when upholding its judgment regarding fee segregation).

earlier complaints were discrete services that directly advanced the Texas breach of contract claims. S-3 Pump's Complaint directly advanced the Texas breach of contract claims in several ways including initiating the adversary proceeding, laying out jurisdiction and venue, naming FNC as a party, and providing background facts relevant to the Texas breach of contract claims. [Record Document 27-50]. S-3 Pump's Second Amended and Restated Complaint also directly advanced the Texas breach of contract claims by, among other things, naming the additional necessary parties to the action and more specifically describing each of the subject transactions. [Record Document 27-51]. Finally, S-3 Pump's Third Amended and Restated Complaint directly advanced the Texas breach of contract claim by formally raising S-3 Pump's breach of contract claim against FNC, providing a detailed description of the transactions related to the Non-Subject Financing Contracts, and detailing each Subject Financing Contract transaction. [Record Document 27-52]. Of note, S-3 Pump's description of each contract and its subsequent assignment follows a formulaic pattern. This means that time spent drafting the paragraphs related to the New York Subject Financing Contracts directly advanced the Texas breach of contract claims because time spent refining any paragraph about a New York Subject Financing Contract was equally applicable to the Texas Subject Financing Contracts.

The bankruptcy court did not abuse its discretion when it determined that S-3 Pump was entitled to $169,793.75 in attorney's fees and the Court therefore **AFFIRMS** the bankruptcy court's judgment.

## CONCLUSION

For the aforementioned reasons, the bankruptcy court's judgment [Bankr. Document 309] is **AFFIRMED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this _14th_____ day of May, 2020.

_____
ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE

27